**IN THE UNITED STATES DISCTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHRISTINE ADAMS**, *et al.*, | : | |
| | : | **Case No. 2:17-CV-200** |
| **Plaintiffs,** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **v.** | : | |
| | : | **Magistrate Judge Kimberly A. Jolson** |
| **OHIO UNIVERSITY**, *et al.*, | : | |
| | : | |
| **Defendants.** | : | |

## OPINON AND ORDER

This matter comes before the Court on Defendants Ohio University's and Joseph McLaughlin's Motion to Plaintiffs' Amended Complaint (ECF No. 28). Defendants seek to dismiss all claims alleged against them. For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss.

## I.    BACKGROUND

### A.    Factual Background[1]

Plaintiffs Christine Adams and Susanna Hempstead are female graduate students in Defendant Ohio University ("the University")'s English Department. (ECF No. 23 at ¶¶ 14, 45). The University is a public educational institution located in Athens, Ohio that receives federal funding. (*Id.* at ¶¶ 3-4). Defendant Andrew Escobedo was a professor at the University who taught Introduction to English Studies (ENG 5950), a class in which both Plaintiffs were enrolled in the fall of 2015. (*Id.* at ¶¶ 5, 15-16, 46). Defendant Joseph McLaughlin is also an English professor at the University, and previously was the chair of the English Department. (*Id.* at ¶¶ 8-9).

---

[1] In adjudicating this motion to dismiss, the Court accepts as true all well-pleaded factual allegations from the second amended complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

1.     <u>Sexual Harassment Against Plaintiffs</u>

Professor Escobedo invited all of the students in his Introduction to English Studies class, including Ms. Adams and Ms. Hempstead, to an end-of-the-semester celebration at Jackie O's Pub to begin at 7:00 p.m. on December 3, 2015.  (*Id.* at ¶¶ 16, 47, 17).  Both Ms. Adams and Ms. Hempstead attended the gathering.  Ms. Adams arrived early, approximately five to ten minutes before the party began, while Ms. Hempstead was one of the last students to arrive.  (*Id.* at ¶¶ 17, 48).  Upon Ms. Adams' arrival, Professor Escobedo immediately began buying rounds of alcoholic beverages for the students, and he continued to do so throughout the evening.  (*Id.* at ¶¶ 18, 22, 60).  He bought five to six drinks for Ms. Adams over the course of the night.  (*Id.* at ¶ 34).

When Ms. Hempstead arrived, she at first sat next to Professor Escobedo.  (*Id.* at ¶ 48).  Later, when she went to the bar to buy a drink, Professor Escobedo followed her.  (*Id.* at ¶ 49).  He placed his hand on her back and told the bartender to put her drink on his tab.  (*Id.*).  After they returned to their seats, Professor Escobedo touched Ms. Hempstead on her hand, upper thighs, back, waist, and buttocks, as well as other areas of her body that were not visible to the rest of the group.  (*Id.* at ¶ 50).  Earlier that evening, Professor Escobedo told a student who wanted beer instead of liquor that he had to "teach [him/her] something about taste", and Ms. Hempstead then called him an "asshole" in response.  Professor Escobedo then said, "Careful. I still haven't submitted your grade."  (*Id*. at Ex. B, p. 9, 38).  Thus, Ms. Hempstead believed her response to his physical advances could impact her grade.  (*Id.* at ¶¶ 53-54).  Ms. Hempstead attempted to increase the distance between herself and Professor Escobedo to signal that the advances were unwanted and to prevent further physical contact, but Professor Escobedo was

apparently undeterred—he continued the unwanted touching.  (*Id.* at ¶ 57).   Ms. Adams witnessed Professor Escobedo touching Ms. Hempstead's knees, thigh, and back.  (*Id.* at ¶ 19).

Around 9:45 p.m., Professor Escobedo and a group of students, including Ms. Adams and Ms. Hempstead, left Jackie O's Pub and went to Tony's Tavern.  They arrived at the second bar around 10:10 p.m.  (*Id.* at ¶¶ 20-21).  At Tony's Tavern, Ms. Hempstead piled jackets and bags next to her seat in attempt to prevent Professor Escobedo from sitting next to her, but he moved the items and positioned himself directly in between Ms. Hempstead and Ms. Adams.  (*Id.* at ¶¶ 24, 62).  Professor Escobedo continued to make unwanted physical contact with Ms. Hempstead throughout the evening, including touching her over her clothes on her hands, arms, thighs, legs, knees, waist, lower back, buttocks, breast, and vagina multiple times.  (*Id.* at ¶¶ 63-64).  Around 10:45 p.m., Ms. Hempstead left Tony's Tavern because of Professor Escobedo's unwanted sexual advances.  (*Id.* at ¶ 65).  As she was leaving, he approached her and hugged her, touching her breast during the encounter.  (*Id.* at ¶ 66).  Throughout the night and early the next morning, Ms. Hempstead texted her then-boyfriend a series of text messages about being touched by her professor, including on her crotch.  (*Id.* at Ex. B, pp. 43-44).

Professor Escobedo also non-consensually touched Ms. Adams while the group was at Tony's Tavern, placing his hands on her on her face, neck, hands, legs, thighs, knees, back, arms, buttocks, and vagina.  (*Id.* at ¶¶ 25, 26).  Among other incidents of unwanted touching, Professor Escobedo put his hands inside of Ms. Adams' pants to cup her buttocks, touched her butt over her pants twice, touched her back under her shirt, and touched her vagina over her clothing with a rubbing motion.  (*Id.*).  Ms. Adams overheard Professor's comment to Ms. Hempstead telling her to be "careful" since he still had not submitted her grades.  (*Id.* at ¶ 30).  Thus, she believed that her response to his advances could impact her grade.  (*Id.* at ¶ 31).  Even still, Ms. Adams

made faces signaling discomfort, but Professor Escobedo ignored them.  (*Id.* at ¶¶ 27-28).  She also attempted to move away from him by moving to a new seat and placing objects and people between them, but he continued to make physical contact with her.  (*Id.* at ¶ 29).

Around 12:45 a.m. on December 4, the group disbanded.  (*Id.* at ¶ 35).  Ms. Adams left Tony's Tavern with another student, Jessica Cogar, and they began walking toward Ellis Hall at the University.  (*Id.* at ¶ 36).  Professor Escobedo caught up with them and walked with them until they reached Ellis Hall.  (*Id.* at ¶ 36).  Ms. Cogar then went inside the building to use the restroom, leaving Ms. Adams alone with Professor Escobedo.  (*Id.* at ¶ 37).  It was then that Professor Escobedo told Ms. Adams that he was sexually attracted to her, and pressed his body against hers.  (*Id.* at ¶¶ 38-39).  He then kissed her, and inserted his tongue into her mouth.  (*Id.* at ¶ 39).  Ms. Adams did not reciprocate the kiss, and told him that she was not interested in a sexual relationship.  (*Id.* at ¶ 40).  Despite this unambiguous rejection, Professor Escobedo continued to clutch her body against his.  (*Id.* at ¶ 41).  All the while, he rubbed his lower body and erect penis against her.  (*Id.* at ¶ 42).

When Ms. Cogar came back out of Ellis Hall, Professor Escobedo released Ms. Adams, but not before telling her that "she better not tell anyone" about anything that occurred that evening.  (*Id.* at ¶¶ 43, 44).  According to a report authored by the University's Office of Equity and Civil Rights Compliance ("ECRC")[2], after Professor Escobedo and Ms. Cogar went their separate ways to walk to their cars, Ms. Adams met a friend around 1:00 a.m. and told her friend that Professor Escobedo made unsolicited verbal and physical advances on her, including

_____

[2] ECRC is the office within the University responsible for "ensuring that the University maintains an employment and educational environment that is free from discrimination and harassment."  The university Title IX Coordinator is housed within ECRC.  *See https://www.ohio.edu/equity-civil-rights/.*

sexually propositioning her, trying to kiss her, and putting his hand down her pants. (*Id.* at Ex. B). ECRC corroborated the story with Ms. Adams' friend. (*Id.*).

2.    <u>ECRC Investigation and Report</u>

On March 10, 2016, ECRC received a report from the Chair of the English Department about concerns raised by a graduate student representative. (*Id.* at Ex. B). According to the graduate student representative, "an alarming number of students" requested that the faculty address issues of sexual misconduct in the Department. (*Id.*). On the same day, the Chair told ECRC that there had been graffiti in the restroom on the first floor of Ellis Hall stating that Professor Escobedo "is a predator. You are not alone" and that he "preys on young women. The Department knows." (*Id.*). Further graffiti urged students to "Email makeousafe@gmail.com for help / with stories. He must be stopped"; and stated, "Together they can't ignore us." (*Id.*). On March 24, 2016, ECRC received a report of additional graffiti in the restroom in Ellis Hall, stating that "If you have been sexually harassed, touched, etc. by a certain male [Department] prof. <u>GO TO OUPD</u> and file an anonymous report. The Dept. can't catch him without <u>your help</u>!" (*Id.*) (emphasis in original).

Also on March 24, Ms. Adams and Ms. Hempstead requested to meet with ECRC Investigator Jessica Cook. (*Id.*). They ultimately each met with her individually to discuss the allegations. (*Id.*). On March 31, 2016, Professor Escobedo was given notice of the allegations and placed on administration leave pending the outcome of the ECRC investigation. (*Id.*). The investigation culminated in a memorandum of findings, which was issued on December 15, 2016. (*Id.*). The memorandum concluded that Ms. Adams' and Ms. Hempstead's allegations of non-consensual sexual contact, quid pro quo sexual harassment, and hostile environment were all substantiated. (*Id.*). The report recommended submitting the matter to the Department Chair

and the Dean for consideration of possible disciplinary action and further recommended that Professor Escobedo remain on administrative leave and be banned from campus until final determination of disciplinary action. (*Id.*).

On February 5, 2017, Professor Escobedo sent a letter to his colleagues in the English Department. (*Id.* at ¶ 301, Ex. E). He stated that he was unable to give a clear account of what happened on December 3 because of his degree of intoxication, but acknowledged that he bore "serious responsibility for what happened" and "certainly deserve[d] disciplinary action." (*Id.* at ¶¶ 303, 305, Ex. E). Nevertheless, he asked that he not be terminated. (*Id.* at Ex. E).

### 3.    Previous Incidents Involving Professor Escobedo

In addition to the sexual harassment that Plaintiffs allege occurred in December of 2015, the Amended Complaint details a host of previous improprieties allegedly involving Professor Escobedo. According to the Complaint, it has been widely known for over a decade among faculty and students within the University's English Department that Professor Escobedo seeks sexual relationships with students and young faculty. (*Id.* at ¶ 67). It is alleged that both professors and students warn incoming graduate students that Professor Escobedo poses a threat to female students. (*Id.* at ¶¶ 83-84). According to the ECRC's report, Professor Escobedo admitted that three members of the faculty "collectively decided that [he] is a 'sexual predator'" and that one of those faculty members used to "warn incoming graduate students that [he] was a 'sexual predator.'" (*Id.* at Ex. B).

Specifically, Plaintiffs set forth allegations regarding seven sets of factual circumstances. First, in 2003, Professor Escobedo made unwanted advances toward a graduate student in one of his classes, referred to as Complainant #3. (*Id.* at ¶ 102). He invited his class out for drinks at a local bar, where he placed his hands up her shirt and/or skirt. (*Id.* at ¶¶ 104-05). A temporary

adjunct professor witnessed Professor Escobedo place his hands inside Complainant #3's shirt and rub her back.  (*Id.* at ¶ 106).  This incident was not reported to the University at the time. (*Id.* at Ex. B).  Complainant #3 reported the conduct to ECRC on July 12, 2016, and ECRC found the allegations of sexual harassment to be substantiated.  (*Id.*).

Second, in July of 2005, Professor Escobedo sexually harassed the temporary adjunct professor who witnessed the 2003 incident.  The adjunct, referred to as Complainant #5, had gathered with her friends at a restaurant for dinner to celebrate her birthday, before walking to Tony's Tavern for drinks.  (*Id.* at ¶¶ 112-13).  Professor Escobedo, who was not invited to the birthday celebration, showed up at Tony's Tavern and sat next to Complainant #5 at the bar.  (*Id.* at ¶¶ 114-15).  Complainant #5 was wearing a skirt, and Professor Escobedo touched her legs and upper thighs while he sat next to her.  (*Id.* at ¶ 115).  Some of Complainant #5's friends witnessed the incident.  (*Id.* at ¶ 116).  Around 2006, after Complainant #5 moved out of Ohio— and felt that Professor Escobedo could no longer negatively impact her career—she reported the incident to the ECRC.  (*Id.* at ¶ 118).  No record exists of this complaint.  (*Id.*).  ECRC found Complainant #5's allegations of sexual harassment against Professor Escobedo to be substantiated during their 2016 investigations.  (*Id.*at Ex B.).  ECRC further noted that while ECRC no longer has a record of the report in 2006, "multiple witnesses told the Investigator that there was an inquiry by [ECRC] into allegations against [Professor Escobedo] in 2006" so the Investigator did not draw any conclusions from the absence of documentation of Complainant #5's 2006 communication.  (*Id.* at Ex. B., p. 66, n. 33).

Third, Professor Escobedo was involved in a sexual relationship with a female graduate student in 2006 while he was her doctoral thesis advisor.  (*Id.* at ¶¶ 69, 132).  Marsha Dutton, a now-retired English Professor, reported the relationship to Defendant Joseph McLaughlin, who

was Chair of the English Department at the time. (*Id.* at ¶ 137). Professor McLaughlin told her that he would ask Professor Escobedo—a close personal friend of his—about the relationship. (*Id.* at ¶ 138). When Professor McLaughlin confronted Professor Escobedo, Professor Escobedo "adamantly denied" having the relationship. (*Id.* at ¶ 139). Professor Dutton reported the relationship to the ECRC[3], which then conducted a "climate survey" of the English Department, intended to determine if students in the English Department "felt safe." (*Id.* at ¶ 71).

Twenty individuals responded to the climate survey, twelve of whom reported that they were female and seven of whom reported that they were male. (*Id.* at ¶ 74, Ex. A). The results of the climate survey indicate that six out of nineteen students disagreed or strongly disagreed with the statement "Overall, the climate for women in the English Department is good." (*Id.*). Comparatively, no students disagreed and only one out of twenty students strongly disagreed with the statement that "Overall, the climate for men in the English Department is good." (*Id.*). Nine students reported observing "inappropriate sexist language, humor/jokes or comments" once (3) or more than once (6), and six students said that they experienced such inappropriate sexist language, humor/jokes or comments once (2) or more than once (4). (*Id.*). Five students reported observing "seductive remarks, including attempting to establish a sexual relationship" and four students reported experiencing seductive remarks, including attempting to establish a sexual relationship. (*Id.*). Six out of fourteen students responded "no" to the question "I am familiar with the Ohio University Harassment Policy." (*Id.*). Three respondents indicated that they disagreed or strongly disagreed with the statement "I feel safe." (*Id.* at Ex. A).

---

[3] In their Motion to Dismiss, Defendants state that Professor McLaughlin was the one who reported the alleged sexual relationship to the ECRC. Plaintiffs' Complaint alleges that Professor Dutton did so, and the facts must be taken in light most favorable to the Plaintiffs at this stage.

In addition to the survey results, multiple course evaluations made reference to sexual harassment and sexual misconduct by a faculty member. (*Id.* at ¶ 124). Mara Holt, a Professor in the University's English Department, was a member of the Administrative Committee of the English Department about a decade ago. (*Id.* at ¶ 122). The Committee was responsible for gathering and reviewing course evaluations submitted by students regarding their professors and courses from the preceding semester. (*Id.* at ¶ 123). Professor Holt stated that there was conflict among the Committee about how seriously to take the evaluations that referenced sexual misconduct by a faculty member. (*Id.* at ¶ 125). She does not know if the faculty member was named. (*Id.* at ¶ 124). Professor Dutton believes the references were to Professor Escobedo. (*Id.*). Professor Escobedo was the Graduate Chair at the time the course evaluations were submitted, which is a position of power in relation to other faculty in the English Department. (*Id.* at ¶ 126).

Despite the potentially damning course evaluations and the survey results, no thorough investigation was conducted. (*Id.* at ¶¶ 91, 128). Instead, general training for the faculty about sexual misconduct was recommended. (*Id.* at ¶ 129). One English Professor "felt that the 2006 report was not treated with the seriousness that it deserved, and there were no restraints or consequences for [Defendant Escobedo]." (*Id.* at ¶ 80). Plaintiffs allege that Professor McLaughlin failed to investigate and deliberately downplayed the results of the survey because Professor Escobedo was a personal friend. (*Id.* at ¶¶ 87, 91, 130).

Sometime between 2006 and the December 2015 incident involving the Plaintiffs, at least two additional sexual encounters occurred. First, Professor Escobedo made inappropriate sexual contact with Ayesha Hardison, who was a junior faculty member in the English Department. (*Id.* at ¶ 129). Ms. Hardison told a graduate student about the incident, but did not report the incident

to the ECRC. (*Id.*). Second, in 2011, Professor Escobedo tried to kiss Professor Jill Ingram, his faculty mentee, without her consent. (*Id.* at ¶ 131). She reported the incident to Professor McLaughlin, who responded that Professor Escobedo's personality was just "like that." (*Id.*). Professor Ingram asked Professor McLaughlin to intervene, but Professor McLaughlin stated that an intervention "would not happen." (*Id.*). Professor McLaughlin did not report the incident to the ECRC. (*Id.*). Professor Ingram did not initially report the incident to the ECRC either, because she felt as though she could not make an official complaint because she depended on Professor Escobedo's recommendation for tenure. (*Id.*). Since then, Professor Ingram has reported the conduct to the ECRC.

On March 2, 2017, after the ECRC report detailing these incidents was released, Interim President David Descutner sent Professor Escobedo a letter, stating, "for an extended period of years you have engaged in a pattern of sexual advances directed at students whom you have supervised, graded, or advised, as well as colleagues in your department." (*Id.*at ¶ 95). The essence of Plaintiffs' allegations are that the University and Professor McLaughlin's "deliberate indifference" to these past events allowed the harassment against them to occur in December of 2015.

**B.     Procedural History**

On March 8, 2017, Plaintiffs Adams and Hempstead filed this suit against Ohio University, Professor McLaughlin, and Professor Escobedo. (ECF No. 1). In the Amended Complaint, Plaintiffs allege that the University violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 ("Title IX"), and also bring §1983 claims against Professors Escobedo and McLaughlin in their individual capacities for violating their Fourteenth Amendment rights to Equal Protection. (ECF No. 23). Finally, they bring a claim for injunctive relief against

Professor McLaughlin in his official capacity. (*Id.*). Professor Escobedo answered the Amended Complaint. (ECF No. 26). Defendants Ohio University and Professor McLaughlin filed the instant Motion to Dismiss, which seeks dismissal of all claims against them. (ECF No. 28). The matter is fully briefed and ripe for decision.

## II. ANALYSIS

### A. Legal Standard

The Court may dismiss a cause of action under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted."[4] Such a motion "is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations." *Golden v. City of Columbus*, 404 F.3d 950, 958-59 (6th Cir. 2005). The Court must construe the complaint in the light most favorable to the non-moving party. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008). The Court is not required, however, to accept as true mere legal conclusions unsupported by factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although liberal, Rule 12(b)(6) requires more than bare assertions of legal conclusions. *Allard v. Weitzman,* 991 F.2d 1236, 1240 (6th Cir. 1993) (citation omitted). Generally, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In short, a complaint's factual allegations "must be enough to raise a right to relief

---

[4] Defendants style their motion as a motion to dismiss under both Rule 12(b)(6) and Rule 12(b)(1). Rule 12(b)(1) deals with lack of subject-matter jurisdiction. Defendants' motion seeks to dismiss the claims against the University for "[f]ail[ing] to [s]tate a Deliberate Indifference Claim" and asserts that the claims against Professor McLaughlin "[f]ail as a [m]atter of [l]aw." (ECF No. 28 at 5, 9). These arguments are more properly characterized as seeking dismissal for failure to state a claim, rather than for lack of subject matter jurisdiction. Defendants make no arguments that this Court lacks jurisdiction. Thus, the Court will apply the legal standards for a motion to dismiss under Rule 12(b)(6).

above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). It must contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

### B. Claims Against Defendant Ohio University

Plaintiffs assert the following claims against the University under Title IX: strict liability (Counts I and XII), unwanted sexual contact (Counts II and XIII), quid pro quo (Counts III and XIV), hostile environment (Counts IV and XV), and "deliberate indifference resulting in sexual harassment" (Counts V and XVI).

Title IX provides in pertinent part: "No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The statute is enforceable through an implied private right of action, *Cannon v. University of Chicago*, 441 U.S. 677, 717 (1979), and monetary damages are available in such an action, *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 76 (1992). In *Franklin*, the Supreme Court established that the "discrimination" prohibition of Title IX encompasses the sexual harassment of a student by a teacher. *See* 503 U.S. at 75. In *Gebser v. Lago Vista Indep. Sch. Dist*., 524 U.S. 274 (1998), the Supreme Court defined the contours of a school's liability for sexual harassment of a student by a teacher, articulating the "deliberate indifference" standard, which applies here. Under *Gebser*, damages may only be recovered against a school when "an official of the school . . . who at a minimum has authority to institute corrective measures . . . has actual notice of, and is deliberately indifferent to, the teacher's misconduct." 524 U.S. at 277. Constructive knowledge of harassment will not suffice. *Id.*

In *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999), the Supreme Court further expanded upon the deliberate indifference standard, this time in the

context of student-on-student harassment. The Court held that the harassment experienced by a plaintiff "must be so severe, pervasive, and objectively offense that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." 526 U.S. at 650. The deliberate indifference of the educational institution must, "at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *Id.* at 644–45 (internal quotations omitted). The institution need not "remedy" harassment, and can only be liable when its "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id.* at 648-49.

Contrary to Plaintiffs' arguments, Title IX does not create a cause of action for strict liability, even for quid pro quo harassment. While courts may have been split over the proper standards for liability previously, the Supreme Court made clear in *Gebser* and *Davis* that Title IX liability only attaches when a school has *actual* knowledge of the alleged harassment and is deliberately indifferent to it. *Compare Canutillo Indep. Sch. Dist. v. Leija*, 101 F.3d 393, 397 (5th Cir. 1996) (pre-*Gebser* decision noting "[c]ourts have held an employer strictly liable for '*quid pro quo*' harassment," as opposed to 'hostile environment' harassment, which invokes a "knew, or should have known" standard) *with Gebser*, 524 U.S. at 290 (holding that an appropriate official must have "actual knowledge" of harassment and "fail[] to adequately respond"); *see also Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000) ("The recipient is liable for damages only where the recipient itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to known acts of harassment.") (internal citations omitted). Further, despite Plaintiffs' contention, there is not a less stringent standard for teacher-on-student harassment, as opposed to student-on-student harassment—the Sixth Circuit flatly rejected such a distinction. *See Williams ex rel. Hart v. Paint Valley Local*

*Sch. Dist.*, 400 F.3d 360, 367 (6th Cir. 2005) ("It is clear from a reading of *Gebser* and *Davis*, that the Court is discussing only one standard for 'deliberate indifference' under Title IX pupil harassment cases and not, as [plaintiff] contends, one standard for student-on-student harassment and a less stringent standard for teacher-on-student harassment.").

Thus, to make a prima facie case under Title IX, Plaintiffs must show: (1) they were subject to quid pro quo sexual harassment or a sexually hostile environment so severe and pervasive that it deprived them of educational opportunities or benefits; (2) they provided actual notice of the harassment to an "appropriate person," who was, at a minimum, an official of the educational entity with authority to take corrective action and to end discrimination; and (3) the institution's response to the harassment amounted to "deliberate indifference." *Evans v. Bd. of Educ. Sw. City Sch. Dist.*, No. 2:08-CV-794, 2010 WL 2889100, at *7 (S.D. Ohio July 20, 2010), (citing *Klemencic v. Ohio State Univ.*, 263 F.3d 504, 510 (6th Cir. 2001)); *see also Vance*, 231 F.3d at 258–59. Defendants do not dispute at this stage that Ms. Adams and Ms. Hempstead were subject to discrimination, quid pro quo harassment, and/or a sexually hostile environment that was sufficiently pervasive to satisfy the first prong. Thus, the first prong is not at issue. Defendants do dispute, however, both the second and third prongs. The Court will address each factor in turn.

1.    Actual Notice

To survive a motion to dismiss, Plaintiffs' complaint must allege that the University had actual knowledge of Professor Escobedo's misconduct. "Actual knowledge requires only that a single school administrator with authority to take corrective action had actual knowledge of the sexual harassment." *Stiles ex rel. D.S. v. Grainger Cty.*, 819 F.3d 834, 848 (6th Cir. 2016). The actual knowledge required, however, need not be of current abuse. *Williams v. Paint Valley*

*Local Sch. Dist.*, No. C2-01-004, 2003 WL 21799947, at *2 (S.D. Ohio July 16, 2003), *aff'd sub nom. Williams ex rel. Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360 (6th Cir. 2005). The actual notice standard "is met when an appropriate official has actual knowledge of a substantial risk of abuse . . . based on prior complaints of other students." *Id.*

Plaintiffs argue that at least five of the seven previous incidents involving Professor Escobedo should have put the University on notice that he presented a threat to young women: (1) Complainant #5's report to ECRC in 2006 that she was sexually assaulted by Professor Escobedo in 2005 at her birthday gathering; (2) the course evaluations referencing sexual misconduct by a faculty member; (3) the results of the climate survey in 2006; (4) Professor Dutton's report that Professor Escobedo was having a sexual relationship with a graduate student while he was serving as her doctoral thesis advisor; and (5) Jill Ingram's report to Professor McLaughlin in 2011 that Professor Escobedo attempted to kiss her without consent. (ECF No. 34 at 13-14).

Defendants argue that none of the previous allegations of misconduct can be considered for three reasons. First, Defendants argue that Plaintiffs do not have standing to sue based on past allegations of harassment against other individuals. (ECF No. 28 at 8). Defendants cite no case in support of this proposition. Second, Defendants argue that the previous allegations cannot be considered because they are time-barred, given that the relevant statute of limitations is two years. (*Id.* at 8-9); *see also Lillard v. Shelby Cty. Bd. of Educ.*, 76 F.3d 716, 729 (6th Cir. 1996) (the relevant statute of limitations for Title IX actions is the limitations period applicable to personal injury actions); R.C. 2305.10 (personal injury actions in Ohio governed by two year statute of limitations). Both of these arguments fail. The underlying harm in Plaintiffs' complaint is the sexual harassment that occurred against each of them—they are attempting to

vindicate their own rights, not the rights of any of Professor Escobedo's previous victims. Plaintiffs have each clearly alleged their own injury, which occurred in December of 2015, within two years of the time they filed their complaint in March of 2017. Thus, Plaintiffs have standing and their claims are not time-barred.

Defendants argue that the five previous acts Plaintiffs rely on for notice are insufficient as a matter of law to establish notice. (ECF No. 28 at 9). First, Defendants argue that the neither the climate survey nor the course evaluations mention Professor Escobedo specifically, nor do they involve the same degree of harassment. (ECF No. 36 at 4-5). Defendants correctly point out that the climate survey responses could be about graduate students experiencing "seductive remarks" from other graduate students, as the text is not, on its face, limited to faculty. This does not mean, however, that Plaintiffs "can prove no set of facts in support of [their] claim which could entitle [them] to relief." *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 654 (1999) (internal citations omitted). Discovery could show, for instance, that students were told that the survey was in relation to misconduct by faculty members and were instructed to respond accordingly. As to the course evaluations, it could be true, as Defendants allege, that Professor Dutton did not inform an appropriate person at the University that the faculty member referenced in the course evaluations was Professor Escobedo. Or, discovery could reveal that Professor Dutton informed an appropriate person at the University and nothing was done. Similarly, it could be shown through discovery that the course surveys were in regards to a particular course taught by Professor Escobedo—making the lack of his name on the evaluation less of an evidentiary hurdle for Plaintiffs. In short, at this stage, the Court cannot say that Plaintiffs can prove no set of facts that would entitle them to relief.

Next, Defendants argue that Professor Dutton's 2006 report that Professor Escobedo was having a sexual relationship with a student is unsubstantiated and too distant in time to constitute notice. (ECF No. 36 at 6). Defendants rely on a footnote in ECFC's report stating, "it appears that there was insufficient information for [ECFC] to proceed in 2006" and that a witness (who appears to be Professor McLaughlin, as he was the "Department Chair in 2006"), said that the report was based upon rumors. (*Id.*). Thus, they argue, the 2006 incident was a rumor at best, which is not sufficient for notice. It does not escape this Court's notice, however, that this footnote stating "it appears" there was not enough information to proceed was based on Professor McLaughlin's own statement that it was a rumor. Such a statement could be read as self-serving, or discovery may later reveal that Professor McLaughlin's representation is accurate. Under these circumstances, Defendants have not proven as a matter of law that the 2006 report could not constitute notice.

Finally, Defendants argue that the two reports of sexual misconduct against faculty members are not sufficient to provide notice because they involve co-workers, not students, and are too distant in time. The mere fact that Professor Escobedo's previous victims were not students is not enough to save the University from liability as a matter of law. In fact, considering these facts in a light most favorable to Plaintiffs reveals a pattern of preying on young women in the English Department. The Complaint alleges that both faculty victims were young, female members of the Department who were subordinate to Professor Escobedo. One victim (Complainant # 5) was a recent graduate and temporary adjunct professor who believed that Professor Escobedo could impact her career. (ECF No. 23 at ¶¶ 111, 117-18). The other victim (Jill Ingram) was a junior faculty member who was Professor Escobedo's mentee, and the Complaint alleges that the incident of sexual harassment occurred "soon after [Defendant

Escobedo] gained a position of authority over her." (*Id.* at ¶ 131). In both instances, Professor Escobedo is alleged to have sexually assaulted females over whom he had some amount of authority and power. Whether that is sufficient to constitute reasonable notice "does not lend itself well to a determination by the Court" at the motion to dismiss stage. *See Hart v. Paint Valley Local Sch. Dist.*, No. C2-01-004, 2002 WL 31951264, at *9 (S.D. Ohio Nov. 15, 2002) (finding question of whether response to harassment is clearly unreasonable does not lend itself well even to a summary judgment determination).

As to the notion that the allegations are too remote in time—an argument that is repeated throughout Defendants' motion and reply—Defendants cite only to *Escue v. N. Oklahoma College*, 450 F.3d 1146, 1154 (10th Cir. 2006). *Escue* is distinguishable from the facts at issue here. In *Escue*, the plaintiff alleged that on multiple occasions she was inappropriately touched by a professor and that the professor made numerous sexual comments to her. 450 F.3d at 1149. The plaintiff attempted to rely on instances of past misconduct to establish notice. The court found that two of the complaints "occurred nearly a decade before [plaintiff's] complaint, and involved significantly different behavior—a single incident of inappropriate touching and a series of inappropriate name calling" and thus held that they were not sufficient to constitute notice. *Id.* at 1154. The court's analysis relied heavily on the fact that the past allegations were very different than the plaintiff's allegations. *See id.* (noting that "neither [of the previous incidents] involved anywhere near the degree of overt and pervasive harassment that [plaintiff] alleges"). The fact that the allegations were temporally remote was merely one facet of the court's analysis. *Id.* (finding the prior complaints did not constitute notice "*especially* given that nearly ten years had passed") (emphasis added).

Here, the alleged misconduct against the female faculty members is substantially similar to the allegations brought by Plaintiffs. Jill Ingram alleged that Professor Escobedo kissed her without consent, as does Ms. Adams. Complainant #5 alleges that Professor Escobedo touched her inappropriately while sitting next to her at a bar—the exact same bar where Ms. Adams and Ms. Hempstead allege Professor Escobedo touched them inappropriately while they were sitting next to him. Thus, the mere fact that the previous allegations are distant in time will not bar Plaintiffs' claims from continuing at this stage.

This court's opinion in *Hart v. Paint Valley Local Sch. Dist.*, 2002 WL 31951264 (S.D. Ohio Nov. 15, 2002) is instructive, as it resolves similar arguments made by Defendants regarding the notice prong. There, Defendant Harry Arnold was a teacher in the Paint Valley Local School District from 1973 until November of 2000. *Id.* at *1. Plaintiff Williams was one of Arnold's fourth grade students. *Id.* Williams alleged that Arnold inappropriately touched him over a two-week period, including rubbing the inside of his thigh and "bumping against [his] genitalia." *Id.* In 1976, four male students in Arnold's reading class alleged that he inappropriately touched them in essentially the same manner. *Id.* at *2. The 1976 conduct was reported to the school administration and school board, and the Principal conducted several interviews. The Principal determined that ongoing observations were in order and drew no final conclusions. Thereafter, the Principal made an effort to be more visible in Arnold's classroom, instructed him to keep his door open, and use aides more frequently. *Id.*

Years later, in 1990, one of Arnold's sixth grade students alleged that Arnold inappropriately touched him in a substantially similar manner. *Id.* at *3. The student's parents met with the Principal and Arnold to report the allegations, and the Principal then notified the Superintendent, and Children Services. The Sheriff's Department and Children's Services

conducted an investigation, which concluded that there was no substantiating evidence of the child's claims against Arnold's denial. *Id.* The Board took no official action against Arnold and decided he could remain in the classroom, and the Principal once again instructed him to leave his door open and also told him to avoid being alone with students. *Id.* No formal action resulted against Arnold from either the 1990 or the 1976 complaints. *Id.*

The defendants in *Hart* filed a motion for summary judgment arguing in part that the 1976 and 1990 allegations were not sufficient to constitute actual notice. *Id.* at *5. Namely, they argued that none of the previous allegations were substantiated and that the 1976 and 1990 acts were too remote in time to constitute notice. *Id.* The *Hart* court held that *Gebser* does not require that the appropriate official have actual knowledge of current abuse. *Id.* at *6. The court explained:

> Rather, the actual notice standard is met when an appropriate official has actual knowledge of a substantial risk of abuse to children in the school based on prior complaint of other students. While the complaints may be unsubstantiated by corroborating evidence and denied by the allegedly offending teacher, whether such complaints put the school district on notice of a substantial risk to students posed by a teacher is usually a question for the jury.

*Id.* The court thus declined to grant summary judgment in favor of the defendants, since the Plaintiff presented at least enough evidence to create a genuine issue of material fact as to whether the School Board knew of a substantial risk of abuse in light of the prior complaints against Arnold. *Id.* at *7.

Applying the *Hart* principles to the facts here, the Court finds that the previous incidents of harassment Plaintiffs point to for notice are not insufficient as a matter of law. The *Hart* court made clear that previous acts of abuse against victims other than the plaintiff can be considered in determining whether the actual notice standard is met to impose Title IX liability. Thus, Defendants' argument that there is no standing is without merit. Similarly, the *Hart* court relied

on incidents that occurred nearly 20 years prior to the harassment against the plaintiff, so the argument that the claims are time barred or too remote in time must fail.  So too must the argument that Plaintiffs cannot rely on unsubstantiated events as a matter of law—the *Hart* court held that whether such unsubstantiated events could be considered sufficient notice is a question usually for the jury.  Thus, the Court will not give credence to Defendants' arguments that the alleged notice in this case is insufficient as a matter of law.

2.    Deliberate Indifference

Turning to the final prong, the University is only liable if its response to the harassment amounts to deliberate indifference.  *Gebser*, 524 U.S. at 291–92.  Plaintiffs cannot demand a particular disciplinary action.  *Vance*, 231 F.3d at 260.  Indeed, a university "need not . . . engage in particular disciplinary action to avoid Title IX liability."  *Patterson v. Hudson Area Schs.*, 551 F.3d 438, 446 (6th Cir. 2009) (internal quotations omitted).  The school's response, however, must be reasonable in light of the known circumstances.  *Vance*, 231 F.3d at 260-261 (finding "such a minimalist response" of "merely investigating and absolutely nothing more" was not a reasonable response).  If the school "has knowledge that its remedial action is inadequate and ineffective, it is required to take a reasonable action in light of those circumstances to eliminate the behavior."  *Id.* at 261.  In such a case, if the school continues to use the ineffective methods to no avail, it has not acted reasonably in light of the known circumstances.  *Id.*

Defendants argue that "[c]onducting a [s]weeping [i]nvestigation, [p]lacing Defendant Escobedo on [a]dministrative [l]eave, [i]nitiating [d]isciplinary [a]ction, and [e]ffectively [e]nding [f]urther [h]arassment" is not clearly unreasonable.  (ECF No. 28 at 7).  But Defendants' argument misses the mark.  As the *Hart* court aptly explained:

> Defendants focus on the remedial action that they took in response to [Plaintiffs'] complaint[s], indicating that they responded meaningfully to the allegations.  Plaintiffs'

claim, however, does not involve allegations concerning the [University's] conduct *after* the alleged abuse. Plaintiffs complain that, had the [University acted appropriately *before* the alleged abuse, [they] would not have been subjected to misconduct.

2002 WL 31951264, at *8.

Defendants do allege in the Reply Brief that their actions in response to the *previous* allegations of misconduct are not clearly unreasonable either. (ECF No. 36 at 7-8). Specifically, they argue that in response to the rumor that Professor Escobedo was having a consensual sexual relationship with a student in 2006, Professor McLaughlin told Professor Dutton he would confront Professor Escobedo about it—which he did—and Professor Escobedo denied the allegations. Professor McLaughlin then allegedly contacted ECRC, which could not substantiate the rumor. After that, the climate survey was conducted, along with training in the English Department.

But, Defendants' arguments do not account for all of the previous allegations discussed above—allegations which could, through discovery, lead to a finding of deliberate indifference. For example, plaintiffs also allege that the survey results *themselves* should have led to further investigation. It is not clear, what, if anything, was done in response to the course evaluations or the report from the adjunct professor that she was harassed in a way substantially similar to Plaintiffs' allegations. Plaintiffs are entitled to further discovery on these issues. As the *Hart* court stated, the deliberate indifference standard—whether a school's reaction was clearly unreasonable in light of known circumstances—"does not lend itself well to a determination" by the court at the summary judgment stage. *Id.* at *9. This statement is even more potent at the motion to dismiss stage, a stage at which Plaintiffs have not been given an opportunity to conduct full discovery into how the University responded to each instance of previous misconduct. Of course, "in appropriate cases, a court may determine as a matter of law that conduct is not 'clearly unreasonable'" but given the facts alleged here, it cannot be said that

Plaintiffs failed to allege enough facts in their complaint to state a claim that would entitle them to relief.

In sum, Plaintiffs allege sufficient facts at this stage, which, if taken as true, could state a claim upon which relief can be granted. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 654 (1999). Here, Plaintiffs are entitled to discovery and an opportunity to support their claims. Thus, for the reasons stated above, the Court **DENIES** Defendants' motion to dismiss Counts II, III, IV, XIII, XIV, and XV, but **GRANTS** Defendants' motion to dismiss Counts I and XII (for strict liability). Further, Counts V and XVI for "deliberate indifference resulting in sexual harassment" are merely duplicative of counts II, III, IV, XIII, XIV, and XV, alleging deliberating indifference resulting in sexual harassment for unwanted sexual contact, quid pro quo harassment, and hostile environment, and thus the court **GRANTS** Defendants' motion to dismiss Counts V and XVI as well.

### C.        Claims Against Defendant McLaughlin

Plaintiffs assert the following claims against Professor McLaughlin: § 1983 claims against him in his individual capacity seeking damages for violation of the Fourteenth Amendment (Counts XI and XXII), and claims against him in his official capacity seeking injunctive relief for violations of the Fourteenth Amendment (Counts X and XXI).

#### 1.        Damages

Section 1983 provides a cause of action to individuals whose constitutional rights are violated by persons acting under the color of state law. 42 U.S.C. § 1983. To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the

Constitution and laws of the United States, and (2) that the defendant deprived plaintiff of this federal right under the color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61. In a § 1983 claim, "the requisite standard of culpability is deliberate indifference." *Evans v. Bd. of Educ. Sw. City Sch. Dist.*, No. 2:08-CV-794, 2010 WL 2889100, at *9–10 (S.D. Ohio July 20, 2010), *aff'd in part,* 425 F. App'x 432 (6th Cir. 2011). The deliberate indifference standard under § 1983 and Title IX are "substantially the same." *Stiles*, 819 F.3d 834, 852 (6th Cir. 2016). "Here, the Court already has determined that Plaintiffs have advanced some [allegations] . . . as to the existence of deliberate indifference with respect to their claim under Title IX. The Court therefore concludes likewise. . . Plaintiff's claim under § 1983" will survive a 12(b)(6) motion. *Hart*, 2002 WL 31951264, at *10.[5]

Defendants argue that even if Plaintiffs state a plausible § 1983 claim, Professor McLaughlin cannot be sued in his individual capacity because he is entitled to qualified immunity. (ECF No. 28 at 14). Under the doctrine of qualified immunity, government officials are not liable for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982) (internal quotations omitted)). The doctrine seeks to "balance[] two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties

---

[5] The only argument Defendants make in the section of their Motion to Dismiss discussing Professor McLaughlin's § 1983 liability that is different from the arguments this Court already rejected in the Title IX context, is that, at least in regards to the 2011 incident involving Jill Ingram, Professor McLaughlin was not the Chair of the English Department at the time and was therefore not in a position to take corrective action. (ECF No. 28 at 13). The Court, however, will allow Plaintiffs an opportunity for discovery into whether Professor McLaughlin was in such a position.

reasonably." *Id.* There is a two-part test to ascertain whether a defendant is entitled to qualified immunity: "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right," and "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The Court can consider the prongs in any order, and if either is not met, then the officer is entitled to qualified immunity. *Doe v. Miami Univ.*, No. 17-3396, 2018 WL 797451, at \*17 (6th Cir. Feb. 9, 2018) (internal citations omitted).

In order to satisfy the second prong, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he was doing violates that right." *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 604–06 (S.D. Ohio 2016) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). To determine whether a right is clearly established, "a district court must look to then-existing binding precedent from the Supreme Court, the Sixth Circuit or itself." *Klemencic v. Ohio State Univ.*, 111 F.3d 131 (6th Cir. 1997). The determination of whether a right is clearly established must be "undertaken in light of the specific context of the case, not as a broad general proposition." *Wilson v. Columbus Bd. of Educ.*, 589 F. Supp. 2d 952, 964 (S.D. Ohio 2008) (quoting *Floyd v. City of Detroit,* 518 F.3d 398, 405 (6th Cir.2008)). However, "officials can still be on notice that their conduct violates clearly established law even in novel factual circumstances." *Id.* (quoting *Hope v. Pelzer,* 536 U.S. 730, 741 (2002)). When the defendant "raises qualified immunity as a defense, as the Defendants have done in this case, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity. *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009).

Qualified immunity is "typically addressed at the summary judgment stage of the case," though it may be decided on a motion to dismiss. *Thompson v. Ohio State Univ.*, 990 F. Supp. 2d 801, 811 (S.D. Ohio 2014). In other words, courts should resolve questions of qualified immunity "at the earliest possible point," but "that point is usually summary judgment and not dismissal under Rule 12." *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 664 (S.D. Ohio 2016) (internal quotations omitted). At the motion to dismiss stage, the relevant inquiry is whether the plaintiff has alleged "facts which, if true, describe a violation of a clearly established statutory or constitutional right of which a reasonable public official, under an objective standard, would have known." *Id.*

Here, Plaintiffs allege that the clearly established right violated by Professor McLaughlin is the "right to be free from sexual discrimination while they were students at publicly funded university." (ECF No. 34 at 28). The Sixth Circuit has held that students have a "clearly established right under the substantive component of the Due Process Clause to personal security and to bodily integrity, [and] that such right is fundamental." *Doe v. Claiborne Cty., Tenn. By & Through Claiborne Cty. Bd. of Educ.*, 103 F.3d 495, 507 (6th Cir. 1996). And "if the right to bodily integrity means anything, it certainly encompasses the right not to be sexually assaulted under color of law." *Id.* (internal quotations omitted). Indeed, "no rational individual could believe that sexual abuse by a state actor is constitutionally permissible under the Due Process Clause." *Id.* As Defendants acknowledge, the Sixth Circuit has also recognized that "a public official's deliberate indifference to known sex discrimination can violate the Fourteenth Amendment's Equal Protection Clause." (ECF No. 28 at 11) (citing *Stiles ex rel. D.S. v. Grainger County, Tenn.*, 819 F.3d 834, 851-53 (6th Cir. 2016)).

The only remaining question, then, is whether the facts Plaintiffs allege make out a violation of a constitutional right. Plaintiffs argue that Professor McLaughlin's response to Defendant Escobedo's sexual relationship with a student in 2006 and his response to Jill Ingram's report of sexual harassment in 2011 exhibited the requisite deliberate indifference to establish that Professor McLaughlin violated a constitutional right. (ECF No. 34 at 28). Defendants argue that the 2006 relationship was unsubstantiated—and to the extent it was substantiated it was consensual—such that even if Professor McLaughlin was on notice of the allegations, his response was not deliberately indifferent as a matter of law. (ECF No. 28 at 12). As to the 2011 incident, Defendants argue that Professor McLaughlin was not in a position to take appropriate action.

As discussed above, however, "these are factual issues not appropriate for determination at the pleading stage, much less on the basis of qualified immunity." *Thompson v. Ohio State Univ.*, 990 F. Supp. 2d 801, 816 (S.D. Ohio 2014). Plaintiffs do allege sufficient facts to survive the motion to dismiss stage. For example, they allege that Professor McLaughlin responded to the 2011 incident of harassment by stating Professor Escobedo is just "like that" and he did not report the conduct to the ECRC. (ECF No. 23 at ¶ 131). They allege that Professor McLaughlin knew about the sexual harassment and the risk posed by Professor Escobedo, but that he acted with deliberate indifference because of his close personal relationship with Professor Escobedo. (*Id.* at ¶¶ 131, 132, 135, 233); *see also Doe v. Miami Univ.*, No. 17-3396, 2018 WL 797451, at *18 (6th Cir. Feb. 9, 2018) (rejecting qualified immunity defense when "viewing the allegations in the light most favorable to [plaintiff], . . . a reasonable person in [defendant's] position should have known" that defendant was biased and therefore could not sit on disciplinary hearing panel). They further allege that Professor Escobedo's sexual misconduct was "widely known"

throughout the Department, that both faculty and students warned incoming students about him, and that a reasonable department chair would have investigated his behavior. (*Id.* at ¶¶ 83, 84, 235, 331). Finally, Plaintiffs allege that Professor McLaughlin "interfered and attempted to stop any attempts to report the misconduct to the ECRC." (*Id.* at ¶ 135). There are questions of fact regarding what, exactly, Professor McLaughlin knew and when, what his reactions were and whether they were reasonable, and whether he was in a position to remediate the threats. Thus, at this stage, the Court cannot say that Professor McLaughlin is shielded from liability by the doctrine of qualified immunity.

## 2.    Injunctive Relief

The Eleventh Amendment bars § 1983 suits against officials sued in their official capacity for damages. *Cady v. Arenac Cnty.*, 574 F.3d 334, 342-44 (6th Cir. 2009). The Eleventh Amendment, does not however, necessarily bar suits against officials for prospective injunctive relief. *Diaz v. Mich. Dep't. of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013) (citing *Ex Parte Young*, 209 U.S. 123 (1908)). In order for the *Ex Parte Young* exception to apply, a plaintiff must "seek prospective relief to end a continuing violation of federal law." *Id.*; *see also Idaho v. Coeur d'Alene Indian Tribe*, 521 U.S. 261, 281 (1997) (an allegation of "ongoing violation of federal law where the requested relief is prospective" ordinarily invokes *Ex Parte Young*).

Here, however, the alleged violations of federal law are predicated on past acts, not continuing conduct. The facts alleged in the Complaint in reference to Professor McLaughlin all relate to his allegedly deliberate indifferent response to past allegations of sexual misconduct. (ECF No. 23 at ¶¶ 131, 147). While Plaintiffs state that "Defendant McLaughlin continues to act with deliberate different [sic] toward formal reports," (*Id.* at ¶ 320) such a conclusory allegation

is not sufficient to defeat a motion to dismiss. *Allard v. Weitzman,* 991 F.2d 1236, 1240 (6th Cir. 1993) (citation omitted) (stating that although liberal, Rule 12(b)(6) requires more than bare assertions of legal conclusions).

In any event, the reports Plaintiffs appear to be referring to are the climate survey, the course evaluations, and the "widely circulated conversations in the English Department"—all of which occurred in the past. (ECF No. 23 at ¶ 320). There is no allegation that the University's investigation into the harassment of Plaintiffs was insufficient. Plaintiffs even state that "Defendants' response to the December 15 incident of sexual assault and harassment by Defendant Escobedo is irrelevant" in the deliberate indifference analysis, because "the issue for the Court to determine is if Defendants behaved with deliberate indifference *prior* to the December 2015 incident." (ECF No. 34 at 16). Thus, Professor McLaughlin's current response to harassment is not made an issue in the Complaint. Because all allegations in the Complaint are predicated on past conduct, this Court finds that the § 1983 claims against Professor McLaughlin in his official capacity for injunctive relief cannot proceed. *See Marshall v. Ohio Univ.*, No. 2:15-CV-775, 2015 WL 7254213, at *13 (S.D. Ohio Nov. 17, 2015).[6]

Thus, for the reasons stated above, the Court **DENIES** Defendants' motion to dismiss Counts XI and XXII, but **GRANTS** Defendants' motion to dismiss Counts X and XXI.

---

[6] Plaintiffs also allege in their complaint that Professor McLaughlin recommended Professor Escobedo's wife, who is also a faculty member in the University's English Department, for Chair of the Department. (ECF No. 23 at ¶ 322). Even if true, this lone allegation is insufficient as there is no indication anywhere in the Complaint that Escobedo's wife was involved in any way in the sexual harassment alleged in the Complaint.

### III. CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendants' motion to dismiss Counts I, V, X, XII, XVI, and XXI, and **DENIES** Defendants' motion to dismiss Counts II, III, IV, XI, XIII, XIV, XV, and XXII.

**IT IS SO ORDERED.**


  */s/ Algenon L. Marbley*
**ALGENON L. MARBLEY**
**DATED: March 12, 2018** **UNITED STATES DISTRICT JUDGE**